# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**DEREK BLOCK,** *et al.,*

              **Plaintiffs,**      :

                                   **Case No. 2:20-cv-3686**

      **v.**                         **Judge Sarah D. Morrison**

                                   **Magistrate Judge Chelsey M. Vascura**

**JIM CANEPA,** *et al.,*      :

              **Defendants.**

## <u>OPINION AND ORDER</u>

Through this action, Plaintiffs challenge the constitutionality of portions of Ohio's liquor control laws. (Compl., ECF No. 1.) Plaintiff Kenneth M. Miller is an Ohio resident and wine collector. His co-plaintiff, The House of Glunz, Inc., is an Illinois wine retailer with no permit or license from the Ohio Division of Liquor Control.[1] Defendant Dave Yost serves as Ohio's Attorney General.[2] The Wholesale Beer & Wine Association of Ohio ("WBWAO") has intervened as a defendant. (*See* ECF No. 17.) The matter is before the Court for consideration of Motions for Summary Judgment filed by Plaintiffs (Pls.' Mot. Summ. J., ECF No. 52), the Attorney General (AG's Mot. Summ. J., ECF No. 53), and the WBWAO (WBWAO's Mot. Summ. J., ECF No. 51). The parties have also filed a number of ancillary motions. Plaintiffs seek relief from this Court's prior Orders (Pls.' Am. Mot. Relief,

---

[1] Plaintiff Derek Block voluntarily dismissed his claims. (ECF No. 30.)

[2] The Court dismissed Plaintiffs' claims against all other defendants named in the Complaint. (ECF Nos. 33, 36.)

ECF No. 54), and to strike certain testimony and exhibits offered in support of defendants' Motions for Summary Judgment (ECF Nos. 55–57). Finally, the WBWAO seeks to strike certain testimony and exhibits offered in support of Plaintiffs' Motion for Summary Judgment. (ECF No. 60.) All eight motions, being fully briefed, were the subject of oral argument held on September 9, 2022 (*see* ECF No. 90).

For the reasons set forth below, summary judgment is **GRANTED** in favor of the defendants. Accordingly, Plaintiffs' Motion for Summary Judgment is **DENIED**. Plaintiffs' Motion for Relief from Orders is also **DENIED**. Plaintiffs' Motions to Strike expert testimony are **GRANTED IN PART** and **DENIED IN PART**, and their Motion to Strike lay testimony is **DENIED**. The WBWAO's Motion to Strike is **DENIED as moot**.

## I.    BACKGROUND

### A.    Factual Background

Plaintiffs in this action represent consumers and purveyors of wine. Mr. Miller describes himself as "an active wine consumer who looks for good wines at good prices wherever [he] can find them." (Miller Decl., ECF No. 52-2, ¶ 2.) He finds it "easier and less time-consuming" to shop for wines online, but is sometimes forced "to purchase less desirable wine," due to limitations on sourcing. (*Id.*, ¶ 7.) Chicago-based House of Glunz "is a family business . . . engage[d] in retail wine sales, including online sales, and has customers from all over the country[.]" (Donovan Decl., ECF No. 52-3, ¶ 1–2.) House of Glunz holds licenses to engage in its business from the City of Chicago and the State of Illinois. (Donovan Dep., ECF No. 50, 61:7–

19.) House of Glunz "would obtain an Ohio direct-shipping permit if one becomes available," but it "has no intention of establishing physical premises in Ohio"—principally because the cost of doing so "would increase the cost of [its] wine and decrease its competitiveness." (Donovan Decl., ¶¶ 8–9.)

The instant challenge arises from what Plaintiffs have been *unable* to do. Mr. Miller would like to purchase wine from out-of-state wine retailers and have it shipped directly to his home. (Miller Decl., ¶ 5.) The House of Glunz would like to sell wine to Ohio consumers and ship it directly to their homes. (Donovan Decl., ¶¶ 5–7.) They contend that the regulatory scheme preventing them from doing so runs afoul of the United States Constitution.

### B. Ohio's Liquor Control Laws

Alcohol "is the only consumer product identified in the Constitution. Only its regulation by States is given explicit warrant." *Wine Country Gift Baskets.com v. Steen*, 612 F.3d 809, 813 (5th Cir. 2010). The history of alcohol regulation in America has been told many times. *See Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 139 S.Ct. 2449, 2462–70 (2019); *Granholm v. Heald*, 544 U.S. 460, 476–89 (2005). Without reciting the full history here, it is enough to say that Prohibition began with the Eighteenth Amendment, and ended with the Twenty-first. *See* U.S. Const. amend. XVIII, *repealed by* U.S. Const. amend. XXI. While § 1 of the Twenty-first Amendment repealed the Eighteenth, § 2 prohibits:

> The transportation or importation into any State. . . for delivery or use therein of intoxicating liquors, in violation of the laws thereof[.]

U.S. Const. amend. XXI, § 2. Thus, § 2 "grants the States the power to regulate commerce with respect to alcohol." *Lebamoff Enterprises Inc. v. Whitmer*, 956 F.3d 863, 869 (6th Cir. 2020), *reh'g denied*, Case No. 18-2199, Docket No. 56 (May 26, 2020), *cert. denied*, 141 S.Ct. 1049 (2021).

Ohio has taken full advantage of that power. *See* Ohio Rev. Code § 4301.011. Chapters 4301 and 4303 of the Ohio Revised Code, along with their implementing regulations, establish a comprehensive scheme governing the transportation, importation, distribution, and sale of alcoholic beverages. (Though the definition of "alcohol" extends beyond wine, that particular beverage is the type at issue here.) Together, those laws establish a three-tier system for distributing wine in Ohio. Entities operating in each tier—first, manufacturers; second, wholesalers; and third, retailers—must obtain a permit from the Ohio Division of Liquor Control. *See, e.g.,* Ohio Rev. Code §§ 4303.03, 4303.07, 4303.10, 4303.12. With limited exception, wine must pass through each tier before reaching a consumer. Generally, permitted manufacturers must sell to permitted wholesalers (who may purchase only from permitted manufacturers), *see* Ohio Rev. Code §§ 4303.07, 4303.10, 4301.58(C), and permitted wholesalers must sell to permitted retailers (who may purchase only from permitted wholesalers), *see* Ohio Rev. Code. §§ 4303.03(B)(1), 4303.35; Ohio Admin. Code 4301:1-1-46(B), (F). Wholesalers and retailers are required to maintain a physical presence within the state of Ohio, and all wine sold by those entities is required to "come to rest" at that physical location. (*See* Stevenson/Jones Report, ECF No. 51-2, ¶ 62.a.); *see also* Ohio Rev. Code

4

§§ 4301.10(A)(1), 4301.10(A)(6), 4303.292(A); Ohio Admin Code 4301:1-1-22(B). This prescribed supply chain allows the state's alcohol regulatory and enforcement agencies to keep close watch over the sale and movement of wine throughout Ohio. (*See id.*, ¶ 4.) It has the added benefit of allowing the state to efficiently collect excise taxes, which are paid by manufacturers and wholesalers instead of the much larger population of retailers. (*See* Stevenson/Jones Report, ¶ 77); *see also* Ohio Rev. Code § 4301.43.

To qualify for a permit, participants in the three-tier system must comply with a host of additional regulations and requirements. *See* Ohio Rev. Code § 4303.25. For example, permit applicants must submit to an initial inspection of their premises by the Ohio Division of Liquor Control's Investigative Services Unit. (Powers Decl., ECF No. 53-1, ¶ 8. *See also* Chung Decl., ECF No. 53-2, ¶ 14.) The Compliance Agent conducting that inspection will have received specialized training on Ohio's liquor control laws. (Powers Decl., ¶¶ 9, 12.) A permit holder must submit to renewal inspections of their premises and books and records annually thereafter, as well as inspections based on any complaints the Division might receive. (*Id.*, ¶ 23. *See also* Chung Decl., ¶¶ 18, 20.) During these inspections, Compliance Agents monitor for adherence to: ownership rules, *see, e.g.*, Ohio Rev. Code § 4301.24(B), Ohio Admin. Code 4301:1-1-24(B); environmental cleanliness and product safety standards, *see, e.g.*, Ohio Admin. Code 4301:1-1-17; minimum pricing requirements, *see, e.g.*, Ohio Admin. Code 4301:1-1-03; and form-of-payment restrictions, *see, e.g.*, Ohio Rev. Code § 4301.24(D). (Chung Decl., ¶¶ 17–18.) If a violation is found, the

5

permit holder may be subject to enforcement action—including Correction Notices and fines, up to suspension or revocation of the permit. (Powers Decl., ¶ 24.) Each year, the Division conducts thousands of renewal inspections. (Chung Decl., ¶¶ 21–23.) In the three-year period ending August 31, 2021, the Division issued 1,357 Correction Notices and 129 formal citations to permit holders. (Chung Decl., ¶¶ 25–26.)

Two such regulations are particularly relevant to the case *sub judice*. First, Ohio law prohibits wine retailers who do not have a Division-issued permit from shipping wine directly to Ohio consumers (the "Direct Ship Restriction"). *See* Ohio Rev. Code §§ 4301.58(C), 4301.60, 4303.25, 4303.27. Because Ohio requires permitted retailers to maintain a physical presence in the state, the Direct Ship Restriction has the effect of severely limiting out-of-state retailers' ability to sell their wares to Ohio consumers—even those retailers that are licensed to sell wine by their home state. (*See* Wark Report, ECF No. 52-4, ¶¶ 9–13, 19, 27, 57.) And second, Ohio law prohibits individuals from transporting more than 4.5 liters of wine from out-of-state in any 30-day period (the "Transportation Limit"), further restricting out-of-state retailers' access to the Ohio market. *See* Ohio Rev. Code §§ 4301.20(L), 4301.60

## II.    MOTION FOR RELIEF FROM ORDERS

Plaintiffs' Complaint challenged two provisions of the Ohio liquor control laws—the Direct Ship Restriction and the Transportation Limit—by bringing claims against four state officials—Jim Canepa, Superintendent of Liquor Control for the Ohio Division of Liquor Control; Dave Yost, Ohio Attorney General; Thomas

6

J. Stickrath, Director of the Ohio Department of Public Safety; and Deborah Pryce, Chair of the Ohio Liquor Control Commission. (Compl., ECF No. 1.) Those officials moved to dismiss the Complaint on multiple grounds. (ECF No. 19.) This Court dismissed Plaintiffs' claims against Superintendent Canepa, Director Stickrath, and Chair Pryce after concluding that they were entitled to Eleventh Amendment immunity, and that the *Ex Parte Young* exception to such immunity did not apply. (February 17 Order, ECF No. 33, 13–18.) After supplemental briefing, the Transportation Limit claim was dismissed because Plaintiffs "fail[ed] to sufficiently allege a factual predicate establishing a credible threat of prosecution" for violating the law and, thus, lacked standing to challenge it. (May 12 Order, ECF No. 36, 18.)

Plaintiffs now seek to revive their claims as to Director Stickrath and the Transportation Limit. (*See* Pls.' Mot. Summ. J., Pls.' Am. Mot. Relief.) "District courts have authority both under common law and Rule 54(b) to reconsider interlocutory orders . . . before entry of final judgment." *Rodriguez v. Tenn. Laborers Health & Welfare Fund*, 89 F. App'x 949, 959 (6th Cir. 2004). *See also* Fed. R. Civ. P. 54(b) ("[A]ny order . . . that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties . . . may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."). "Traditionally, courts will find justification for reconsidering interlocutory orders when there is (1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct a clear error or prevent manifest injustice." *Rodriguez*, 89 F. App'x at 959. The Court interprets Plaintiffs' motion as

7

arguing that new evidence justifies reconsideration of the dismissals.[3] The

argument is unavailing.

Plaintiffs' motion rests on two discovery responses from the Attorney

General. (*See* Pls.' Am. Mot. Relief.) First, the following interrogatory response:

> **[PLAINTIFFS' INTERROGATORY NO. 16]:** In your motion to
> dismiss, you assert that none of the defendants has taken or
> threatened any enforcement action regarding the 4.5 liter limit on
> personal transportation of wine in Oh. Rev. Code § 4301.20 (pp. 7, 19).
> State whether this provision would or would not be enforced in the
> future against an Ohio resident who transports more than 4.5 liters of
> wine into the state. By "enforce," we mean any steps to investigate,
> prevent, bring administrative action, initiate criminal prosecution, or
> confiscate the wine, regardless of whether the person or entity is
> ultimately sanctioned.

> **[ATTORNEY GENERAL'S] ANSWER:** Objection. Defendant objects
> that this Interrogatory No. 16 calls for speculation. Subject to and
> without waiving any objections, Defendant answers that the limitation
> provision could be enforced if a law enforcement officer observes an
> excessive amount of wine during the course of an investigation of other
> potential offenses or it may be handled on a complaint-driven basis.
> (e.g. if an individual is transporting an excess amount of wine in
> addition to transporting illegal narcotics, if an individual or entity is
> transporting wine into the state to unlawfully sell at retail).

> Another potential scenario is a trace-back investigation. Defendant
> further states that the Ohio Department of Public Safety, Ohio
> Investigative Unit could conduct a trace-back investigation if it learned
> of an alcohol-related incident involving an underage person resulting
> in serious death or injury. A trace-back investigation could lead to
> additional charges against an individual if the investigation reveals

---

[3] Plaintiffs argue that their motion should be analyzed under Federal Rule of
Civil Procedure 60. Rule 60 applies to motions seeking reconsideration of a final
order. *Payne v. Courier-Journal*, 193 F. App'x 397, 400 (6th Cir. 2006). But the
February 17 and May 12 Orders are not final—they are interlocutory. *See
Consolidation Coal Co. v. U.S. Dep't of Interior*, 43 F. Supp. 2d 857, 863 (S.D. Ohio
1999) (citing *James by James v. Sadler*, 909 F.2d 834, 836 (5th Cir. 1990))
(explaining that "the dismissal of all claims against a particular party" is
interlocutory "so long as claims against other parties remain for adjudication").
Rule 54(b) is, accordingly, the more appropriate framework.

that the source of the alcohol was an individual transporting an excess amount of wine from another State.

(ECF No. 52-34, PAGEID # 4035.) And second, a spreadsheet showing eight arrests and one administrative citation for violations of the Transportation Limit between July 22, 2017, and July 22, 2020. (ECF No. 53-7.) The spreadsheet reflects that, of the eight arrests, five were prosecuted. (ECF No. 53-7, PAGEID # 4481. *See also* Lockhart Decl., ECF No. 68-1, ¶ 7.) All five prosecutions involved spiritous liquor. (Lockhart Decl., ¶¶ 9–10.)

Plaintiffs contend that this information establishes a realistic possibility that the Ohio Department of Public Safety (under Director Stickrath) will enforce the Transportation Limit against them. (ECF No. 74, 3.) The Court disagrees. As discussed at length in the February 17 and May 12 Orders, a plaintiff's standing to bring a pre-enforcement action hinges on a "credible threat of prosecution." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (internal quotation and citation omitted). The Sixth Circuit explained in *McKay v. Federspiel* that a credible threat may be shown by some combination of the following factors: (1) a history of past enforcement; (2) enforcement warning letters sent to the plaintiff about his specific conduct; (3) an attribute of the challenged statute making enforcement easier or more likely; and (4) a defendant's refusal to disavow enforcement of the challenged statute against a particular plaintiff. 823 F.3d 862, 869 (6th Cir. 2016) (citations omitted). However, "the credibility of a 'threat' is diluted when a factual dissimilarity exists between the plaintiff's intended future conduct and the conduct that triggered any prior prosecutions under the challenged statute." *Bronson v.*

9

*Swensen*, 500 F.3d 1099, 1108 (10th Cir. 2007) (citation omitted). The Court concluded that the evidence of past enforcement proffered at the Motion to Dismiss stage was insufficient to confer standing on Mr. Miller.[4] (May 12 Order, 17–18.) That evidence—namely, (i) an undated Reddit post describing the author's arrest on charges for transporting excess bourbon into the state and (ii) a press release announcing charges brought for illegal re-sale of excess alcohol transported into the state—pertained to conduct sufficiently distinct from Mr. Miller's intended conduct that he had not established a credible threat. (*Id.*)

This "new evidence" does not change the Court's prior analysis. The interrogatory response sets out the already-acknowledged fact that the Ohio Department of Public Safety enforces Ohio's liquor control laws (*see* February 17 Order, 17), and provides several scenarios in which it *could* enforce the Transportation Limit—none of which encompass an individual of legal age transporting more than 4.5 liters of wine into the state for personal consumption, as Mr. Miller desires to do. Similarly, the spreadsheet of arrests fails to establish a history of enforcing the Transportation Limit against individuals engaging in Mr. Miller's desired conduct. As was true before, "[n]one of the other factors is present in this case." (May 12 Order, 18.)

The Motion for Relief from Orders is **DENIED**.

---

[4] The House of Glunz failed to submit any declarations or other evidence supporting its standing to challenge the Transportation Limit. (*See* May 12 Order, 16.) Accordingly, it has none. The May 12 Order analyzes only the material submitted by Mr. Miller.

## III.   MOTIONS TO STRIKE

The Court next moves to the parties' several motions to strike evidence

offered in support of the cross-motions for summary judgment.

### A.   Motions to Strike Expert Reports

Three motions to strike expert reports are pending. (*See* ECF Nos. 55, 56, 60.)

The admissibility of expert testimony is governed by Federal Rule of Evidence 702:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

The Rule incorporates the Supreme Court's instruction in *Daubert v. Merrell Dow

Pharma., Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co., Ltd. v. Carmichael*, 526

U.S. 137 (1999). *See* Fed. R. Evid. 702 advisory committee's notes to 2000 and 2011

amendments. This Court serves as a "gatekeeper," tasked with "ensuring that an

expert's testimony both rests on a reliable foundation and is relevant to the task at

hand." *Daubert*, 509 U.S. at 597. Courts are afforded "considerable leeway" both in

determining *whether* to admit expert opinion testimony and *how* to test its

reliability and relevance to the case at bar. *Kumho Tire*, 526 U.S. at 152. The

proponent of the expert testimony bears the burden of proving its admissibility. *See*

Fed. R. Evid. 104(a); *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 478 (6th Cir. 2008). Nonetheless, the Federal Rules of Evidence provide a "permissive backdrop," favoring the admission of expert opinion testimony. *Daubert*, 509 U.S. at 588–89.

### 1.    Plaintiffs' Motions

Plaintiffs move to strike the Expert Report of William C. Kerr, Ph.D. (Kerr Report, ECF No. 66-1) and the Expert Report and Rebuttal Expert Report of Bruce D. Stevenson and Gary E. Jones (Stevenson/Jones Report; Rebuttal Report, ECF No. 51-3). (Mot. to Strike Kerr, ECF No. 56; Mot. to Strike Stevenson/Jones, ECF No. 55.) Dr. Kerr has 25 years' experience as a scientific researcher in the areas of alcohol consumption and public health. (Kerr Report, ¶ 1.)  Messrs. Stevenson and Jones are veterans of the Ohio Division of Liquor Control, respectively having served the agency for 25 and 36 years. (Stevenson/Jones Report, ¶¶ 8, 12.) Through their reports, Dr. Kerr and Messrs. Stevenson and Jones offer expert opinion testimony on alcohol beverage control policy and Ohio's regulatory apparatus.

Because Plaintiffs object to the Kerr Report and the Stevenson/Jones Reports on the same bases (*compare* Mot. to Strike Kerr *with* Mot. to Strike Stevenson/Jones), the Court analyzes the motions together. Though Plaintiffs do not frame their arguments in terms of the test laid out in *Daubert*, the Court interprets their challenge as going to the relevance and reliability of the opinions.

### a)    Legal opinions

Plaintiffs first argue that the Kerr Report and the Stevenson/Jones Reports must be stricken because they "consist[] primarily of inadmissible legal opinions." (Mot. to Strike Stevenson/Jones, 2, 6. *See also* Mot. to Strike Kerr, 4.) "Expert

testimony on the law is excluded because the trial judge does not need the judgment of witnesses." *United States v. Zipkin*, 729 F.2d 384, 387 (6th Cir. 1984). The Court's "special legal knowledge" renders such evidence superfluous. *Id*. Opinion testimony may embrace an ultimate issue, Fed. R. Evid. 704(a), but an opinion "carefully couched in the precise language used in case law" may be suspect. *Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994). Paragraphs 2 and 122 of the Stevenson/Jones Report, and Paragraph 12 of the Kerr Report (not including the sub-paragraphs), are conclusive statements phrased in terms of the "predominant effect" test laid out in *Tennessee Wine*. In other words, they appear to answer precisely the legal question before the Court. The Court uses its "scalpel," *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 316 (6th Cir. 2019), to strike those three paragraphs.

### b) Hearsay

Plaintiffs next argue that the Reports are impermissibly based on hearsay for which no proper foundation was laid. (Mot. to Strike Stevenson/Jones, 4, 6; Mot. to Strike Kerr, 6.)  The Federal Rules of Evidence allow an expert to

> base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.

Fed. R. Evid. 703.

As to Dr. Kerr, Plaintiffs focus their argument on the fact that Rule 703 permits expert opinions *based on* inadmissible data—but does not permit the inadmissible data itself. (ECF No. 76, 9.) Dr. Kerr specifically states that "[a]ll of

the opinions expressed in [his] report are [his] own independent conclusions." (Kerr Report, ¶ 11.)

As to Messrs. Stevenson and Jones, Plaintiffs insist that "[i]t is inconceivable that experts in the alcohol and public health field would rely on" sources such as "a 1933 book on the evils of alcohol" or an article from Forbes magazine.[5] (ECF No. 75, 7.) But the pair relied on studies, data, and literature that they "believe [to be] appropriate in view of the facts and nature of this case[.]" (Stevenson/Jones Report, ¶ 20.) Without more, Plaintiffs' indignation as to the date or form in which the relied-upon sources were published is insufficient to call the reasonableness of that reliance into question.

### c)    Reliability

Finally, Plaintiffs argue that the portions of the Kerr Report and the Stevenson/Jones Reports opining on the effects of eliminating the Direct Ship Restriction are unreliable because they "are not based on adequate data or the product of reliable methodology." (Mot. to Strike Stevenson/Jones, 4. *See also* Mot. to Strike Kerr, 2–4.) Their principal complaint is that the reports cite no "concrete evidence showing that any of these harmful effects have occurred in the states that allow out-of-state retailers to ship wine to consumers[.]" (Mot. to Strike Stevenson/Jones, 5. *See also* Mot. to Strike Kerr, 2–3.) The argument is unpersuasive. An expert must have "good grounds" for her opinion, *Daubert*, 509

---

[5] 1933 was, in fact, a watershed year in the field of alcohol regulation. *See Bridenbaugh v. Freeman-Wilson*, 227 F.3d 848, 853 (7th Cir. 2000) ("America changed course in 1933 and repealed the eighteenth amendment [establishing Prohibition] by § 1 of the twenty-first.").

U.S. at 590, but "mere weaknesses in the factual basis of an expert witness'
opinion . . . bear on the weight of the evidence rather than on its admissibility."
*McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000) (cleaned up).
Plaintiffs do no more than point out a weakness in the expert reports.

Plaintiffs' Motion to Strike Stevenson/Jones Reports and Motion to Strike
Kerr Report are each **GRANTED IN PART** and **DENIED IN PART**.

### 2.    WBWAO's Motion to Strike Wark Report

The WBWAO moves to strike the expert report of Tom Wark. (ECF No. 60.)
Plaintiffs offer Mr. Wark's report in support of their Motion for Summary
Judgment. (*See* Wark Report.) Because Plaintiffs fail, even with Mr. Wark, to
establish that they are entitled to judgment as a matter of law, the motion is
**DENIED as moot**.

### B.    Plaintiffs' Motion to Strike Lay Opinion Testimony

Finally, Plaintiffs move to strike portions of the sworn declarations offered
by: Shaun Powers, a Compliance Agent Supervisor for the Ohio Division of Liquor
Control's Investigative Services Unit (Powers Decl., ¶ 2); Frank Chung, Chief of the
Investigative Services Unit (Chung Decl., ¶ 3); and Melissa A. Schiffel, the elected
prosecutor for Delaware County, Ohio (Schiffel Decl., ECF No. 53-5, ¶ 3). (ECF No.
57.) All three are lay witnesses offering opinion testimony in support of the
Attorney General's motion for summary judgment. Under Federal Rule of Evidence
701, a lay witness may only testify as to an opinion that is:

(a) rationally based on the witness's perception;

15

(b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and

(c) not based on scientific, technical, or other specialized knowledge[.]

Plaintiffs first move to strike the following paragraph of Mr. Powers's declaration:

> 7.    Ohio's liquor control laws generally require beer and wine sold in Ohio to pass through Ohio's three-tier system of alcoholic beverage distribution. The three-tier system consists of suppliers (including manufacturers), wholesale distributors, and retailers. Each tier is regulated and licensed by the State of Ohio, with the goal of ensuring public health and safety.

(Powers Decl., ¶ 7.) Plaintiffs argue that this paragraph constitutes an improper legal opinion. (ECF No. 57, 2.) The Court disagrees. Mr. Powers simply recites his understanding of the framework in which his team operates. The fact that the statement pertains to a scheme established by law does not transform it into an impermissible legal opinion. *See Berry*, 25 F.3d at 1353–54 ("It is the responsibility of the court, not testifying witnesses, to define legal terms.").

Plaintiffs also move to strike the following:

<u>Powers Declaration</u>

> 31.    Given the absence of any mechanism to ensure that out-of-state retailers shipping to Ohio comply with Ohio's health and safety regulations, there is an increased and uncontrollable risk of sale to minors, unlawful price manipulation, or other violations of Ohio laws and regulations if out-of-state retailers are allowed to sell and ship wine or other alcohol products to Ohio on the same bases as in-state retailers that can be physically inspected by the Division.

(Powers Decl., ¶ 31.)

16

### Chung Declaration

31. Based on information and experience, voluntary compliance is not a feasible mechanism for ensuring that out-of-state retailers shipping to Ohio comply with applicable Ohio health and safety regulations. As indicated above, the Division has issued over a thousand Correction Notices and over one hundred Citations to Ohio liquor permit holders over the past three years. These permit holders know they are subject to annual physical inspection by the Division, yet hundreds still commit violations. Retailers that are not subject to annual physical inspection by the Division have even less incentive to ensure compliance with applicable Ohio laws.

32. Reliance on authorities in other states is also not a feasible mechanism for ensuring that out-of-state retailers shipping to Ohio comply with applicable Ohio health and safety regulations. First, the Division has no way of guaranteeing that other state enforcement authorities will agree to cooperate with Ohio and inspect retailers located in their states for compliance with Ohio laws and regulations. Additionally, even if another state did agree to such cooperation, agents in those states will not receive the same training as Ohio's Compliance Agents, who are trained specifically and exclusively on Ohio's laws.

33. Given the absence of any mechanism to ensure that out-of-state retailers shipping to Ohio comply with Ohio's health and safety regulations, there is an increased and uncontrollable risk of fraud, theft, sale to minors, unlawful conflicts of interest, unlawful price manipulation, or other violations of Ohio laws and regulations if out-of-state retailers are allowed to sell and ship wine or other alcohol products to Ohio on the same bases as in-state retailers that can be physically inspected by the Division.

(Chung Decl., ¶¶ 31–33.)

### Schiffel Declaration

9. I am concerned that the increased availability of alcohol, particularly over the internet, may result in increased levels of alcohol consumption in Delaware County, which, in turn, may result in increased levels of criminal activity.

(Schiffel Decl., ¶ 9.)

Plaintiffs argue that these portions of the witnesses' declarations do not comport with Rule 701 because they not based on witness perceptions, are not helpful to determining a fact at issue in the case, and are speculative. (ECF No. 57, 2–3; ECF No. 77.) Again, the Court disagrees. As to Mr. Powers and Mr. Chung, the statements are rationally based on their perceptions as members of the team charged with enforcing the Ohio liquor control laws, and helpful to determining how those laws are executed and enforced in practice. And as to Attorney Schiffel, the statement is rationally based on her perception as a county prosecutor, and is helpful to determining the impact of the laws' enforcement. While the testimony, by its nature, is somewhat speculative, the Court is "convinced," based on the balance of their declarations, that these witnesses "kn[o]w enough from firsthand knowledge to testify rationally as to" the expected effects of a change in the laws they enforce. *Heritage Mut. Ins. Co. v. Reck*, 127 F. App'x 194, 199 (6th Cir. 2005).

Plaintiffs' Motion to Strike Inadmissible Lay Opinions (ECF No. 57) is **DENIED**.

## IV.    MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). The burden then shifts to the nonmoving

party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. *See also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the nonmoving party).

Here, Defendants have submitted sufficient admissible evidence that there is no genuine issue of material fact and they are entitled to judgment as a matter of law. Plaintiffs have failed to present significant probative evidence establishing otherwise.

## A.    *Lebamoff Enterprises* is controlling.

Three months before Plaintiffs filed the instant action, the Sixth Circuit issued a decision in *Lebamoff Enterprises Inc. v. Whitmer*, 956 F.3d 863 (6th Cir. 2020), *reh'g denied*, Case No. 18-2199, Docket No. 56 (May 26, 2020), *cert. denied*, 141 S.Ct. 1049 (2021), a strikingly similar case challenging Michigan's analogue to the Direct Ship Restriction. The question before the Court in this case has

transformed from whether the Direct Ship Restriction is constitutionally sound to whether *Lebamoff* is binding on the Court's consideration thereof. (*See* ECF No. 80, 1 (stating that "[b]efore this Court can analyze the constitutionality of Ohio's wine shipping ban, it will have to decide which Sixth Circuit precedents to follow" and conceding that the Court's decision on whether "to follow *Lebamoff* . . . will largely determine the outcome of this case").) Of course, *Lebamoff* is binding. *See Hall v. Eichenlaub*, 559 F. Supp. 2d 777, 782 (E.D. Mich. 2008) ("[A] district court is bound by the decisions of the Circuit Court of Appeals in which it sits.)"

Michigan has a three-tier system of alcohol distribution. *See Lebamoff*, 956 F.3d at 867. Michigan law requires licensed retailers to maintain a physical presence within the state. *Id*. It also prohibits out-of-state retailers from shipping wine directly to Michigan consumers, while permitting in-state licensed retailers to do so. *Id*. The *Lebamoff* court[6] considered whether this scheme violated the dormant Commerce Clause. *Id*. The court began by explaining that "[r]esolution of th[e] case turns on the accordion-like interplay" between the Commerce Clause and the Twenty-first Amendment:

_____

[6] The opinion in *Lebamoff* was authored by Chief Judge Sutton, and Judges McKeague and Donald joined in that opinion. *Lebamoff*, 956 F.3d at 867. Judge McKeague also authored a concurring opinion, in which Judge Donald joined, analyzing the challenged statutes in the context of e-commerce. *See id*., at 877 (McKeague, J., concurring) ("I believe . . . the crux of this case is the online shipping component."). Throughout their briefing, Plaintiffs mischaracterize and inappropriately seek to depreciate the court's opinion as one reflecting the views of Chief Judge Sutton alone. (*See, e.g.*, ECF No. 80, 10 ("Judge Sutton's opinion does not control this Court's analysis because it cannot overrule the Supreme Court or prior Sixth Circuit precedents."); Pls.' Mot for Summ. J., 13, n.7.) But the fact of a concurrence signed by two of the three judges comprising the panel does not render the principal opinion that of a single judge.

The [Commerce] Clause grants Congress power to preempt or permit state laws that interfere with interstate commerce, and it impliedly "prohibits state laws," as determined by the federal courts, "that unduly restrict interstate commerce." *Tenn. Wine & Spirits*, 139 S. Ct. at 2459. Under the implied prohibition, if a state law discriminates against "out-of-state goods or nonresident economic actors," it may survive only if tailored to advance a legitimate state purpose. *Id*. at 2461.

. . . While the Commerce Clause grants Congress power to eliminate state laws that discriminate against interstate commerce, the Twenty-first Amendment grants the States the power to regulate commerce with respect to alcohol. Section 2 of the Amendment bars "[t]he transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof." U.S. Const. amend. XXI, § 2. The section gives the States broad latitude to regulate the distribution of alcohol within their borders. *See North Dakota v. United States*, 495 U.S. 423, 432–33, 110 S.Ct. 1986, 109 L.Ed.2d 420 (1990) (plurality opinion); *see also id*. at 447–48, 110 S.Ct. 1986 (Scalia, J., concurring in the judgment). Indeed, had Congress (as opposed to the people through the ratification process) enacted this exact law, it is doubtful there would be any role for the federal courts to play. When faced with a dormant Commerce Clause challenge to an alcohol regulation, as a result, we apply a "different" test. *Tenn. Wine & Spirits*, 139 S. Ct. at 2474. Rather than skeptical review, we ask whether the law "can be justified as a public health or safety measure or on some other legitimate nonprotectionist ground." *Id*. But if the "predominant effect of the law is protectionism," rather than the promotion of legitimate state interests, the Twenty-first Amendment does not "shield[ ]" it. *Id*.

*Id*. at 869.

Applying this framework, the Sixth Circuit found that the challenged statute "promotes plenty of legitimate state interests." *Id*. at 871. What is, and what is not, a legitimate state interest in the context of alcohol regulation is not a difficult question to answer. As the *Lebamoff* court explained, curbing over-consumption and controlling distribution of alcohol are themselves sufficient. *Id*. (quoting *North Dakota*, 495 U.S. at 433). *See also id*. at 879 (McKeague, J., concurring) (noting that

21

the three-tier system of alcohol regulation has many "baked-in public health justifications").

After summarizing analogous cases from across the country, the court concluded:

> [T]here is nothing unusual about the three-tier system, about prohibiting direct deliveries from out of state to avoid it, or about allowing in-state retailers to deliver alcohol within the State. Opening up the State to direct deliveries from out-of-state retailers necessarily means opening it up to alcohol that passes through out-of-state wholesalers or for that matter no wholesaler at all. *See* [*Arnold's Wines, Inc. v. Boyle*, 571 F.3d 185, 185 n.3 (2d Cir. 2009)]. That effectively eliminates the role of Michigan's wholesalers. If successful, Lebamoff's challenge would create a sizeable hole in the three-tier system. Michigan imposes heavy taxes on all alcohol products at the wholesale level . . . , prompting higher prices than a free market would bear. . . . That leaves too much room for out-of-state retailers to undercut local prices and to escape the State's interests in limiting consumption.
>
> There's ample reason to think Indiana retailers like Lebamoff would do just that.

*Id*. at 872.

Plaintiffs argue that *Lebamoff* is an aberration and should not factor into this Court's decision on the motions now before it. (*See* ECF No. 80, 2.) Instead, they urge the Court to follow the Sixth Circuit's pre-*Tennessee Wine* cases—namely, *Heald v. Engler*, 342 F.3d 517 (6th Cir. 2003), *aff'd sub nom Granholm v. Heald*, 544 U.S. 460 (2005); *Byrd v. Tenn. Wine & Spirits Retailers Ass'n*, 883 F.3d 608 (6th Cir. 2018), *aff'd sub nom Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 139 S.Ct. 2449 (2019); *Jelovsek v. Bredesen*, 545 F.3d 431 (6th Cir. 2008); and *Cherry Hill*

*Vineyards v. Lilly*, 553 F.3d 423 (6th Cir. 2008)—which they argue command a decision in their favor. [7]

But the Court declines Plaintiffs' invitation to bake this cake from scratch. *Lebamoff* is good law, and is controlling and dispositive. While Plaintiffs argue that *Lebamoff* is an "outlier" and does not follow prior Sixth Circuit precedent (*see* ECF No. 80, 2–3, 8), they fail to acknowledge that *Tennessee Wine* establishes a "different" test (which *Lebamoff*, in fact, applies). [8]

---

[7] The thrust of Plaintiffs' argument is that the strict test applied in ordinary dormant Commerce Clause cases should also apply here. (*See* Pls.' Mot. for Summ. J., 13.) But *Tennessee Wine* (decided after the four cases on which Plaintiffs rely) clarified that the Twenty-first Amendment commands a "different inquiry." 139 S.Ct. at 2474. The Fourth Circuit aptly explains why:

> The Plaintiffs concede on appeal that, when a statute regulating products other than alcoholic beverages is challenged, the ordinary dormant Commerce Clause analysis applies, triggering "a variant of strict scrutiny" and requiring invalidation of the discriminatory statute "unless the state demonstrates both that the statute serves a legitimate local purpose, and that this purpose could not be served as well by available nondiscriminatory means." And they also recognize that "the Twenty-first Amendment gave states greater regulatory authority over alcoholic beverages than they have over other products." Based on those two correct observations, a less demanding standard of review must necessarily apply to an alcoholic beverage control regime than to regulations involving other products. Put most simply, applying the same stringent test to an alcoholic beverage control regime would undermine Section 2 of the Twenty-first Amendment.

*B-21 Wines*, 36 F.4th at 225 (internal citations omitted). *Accord Bridenbaugh*, 227 F.3d at 851 ("[Section] 2 of the twenty-first amendment empowers Indiana to control alcohol in ways that it cannot control cheese.").

[8] "[O]nly the Court sitting *en banc* may overrule published circuit precedent, absent an intervening Supreme Court decision or a change in the applicable law." *Cooper v. MRM Inv. Co.*, 367 F.3d 493, 507 (6th Cir. 2004).

23

**B.    Ohio's Direct Ship Restriction can be justified on legitimate nonprotectionist grounds, and their predominant effect is not protectionism.**

The portions of Ohio law at issue here are substantively identical to the Michigan law discussed in *Lebamoff*. Ohio has a three-tier system. Wholesalers and retailers must be permitted by the Division. Permitted retailers must purchase their product from permitted wholesalers, and must maintain a physical presence within the state.[9] They must also comply with a litany of other regulations—including opening their premises and books and records to regulators, and selling merchandise at a mandatory mark-up. Ohio's liquor control enforcement agencies routinely conduct inspections of physical premises to ensure compliance with the liquor control laws, and routinely bring enforcement actions against violators. Allowing out-of-state retailers to ship wine directly to Ohio consumers would all but topple the scheme that the Ohio General Assembly has established, with prices easily undercut and enforcement agencies easily neutered. *See Lebamoff*, 956 F.3d at 872 ("Once out-of-state delivery opens, the least regulated (and thus the cheapest) alcohol will win."). *Accord B-21 Wines, Inc. v. Bauer*, 36 F.4th 214, 228 (4th Cir. 2022) (observing that striking down North Carolina's corollary to the

---

[9] In briefing, Plaintiffs dispute that physical presence is a permissible requirement. (Pls.' Mot. Summ. J., 10.) But in *Lebamoff*, the parties "agree[d] that Michigan may impose all manner of regulations . . . on its retailers," including "that they be present in the State[.]" 956 F.3d at 867. Even more recently, the Eighth Circuit concluded that physical presence was an "essential feature of [Missouri's] three-tiered system." *Sarasota Wine Mkt., LLC v. Schmitt*, 987 F.3d 1171, 1184 (8th Cir. 2021). The Fifth Circuit has also held that "physical location of businesses . . . is a critical component of the three-tier system." *Wine Country Gift Baskets*, 612 F.3d at 821.

24

Direct Ship Restrictions "would open the North Carolina wine market to less regulated wine, undermining the State's three-tier system and the established public interest of safe alcohol consumption that it promotes"), *reh'g denied*, No. 21-1906, Docket No. 58 (June 28, 2022); *Sarasota Wine Mkt., LLC v. Schmitt*, 987 F.3d 1171, 1184 (8th Cir. 2021) (finding that Missouri's corresponding laws "are an essential feature of its three-tiered scheme" and are constitutionally permissible) *reh'g denied, cert. denied,* 142 S.Ct. 335 (2021).

In short and in sum, Ohio's Direct Ship Restrictions can be justified on legitimate nonprotectionist grounds, and their predominant effect is not protectionism. Accordingly, the Attorney General and the WBWAO are entitled to judgment as a matter of law; their motions for summary judgment are **GRANTED** and Plaintiffs' **DENIED**.

## V.    CONCLUSION

For the reasons set forth above, the Attorney General's Motion for Summary Judgment (ECF No. 53) and WBWAO's Motion for Summary Judgment (ECF No. 51) are **GRANTED**. Plaintiffs' Motion for Summary Judgment (ECF No. 52) is **DENIED**; Amended Motion for Relief from Orders (ECF No. 54) is **DENIED**; Motion to Strike Kerr Report (ECF No. 55) is **GRANTED IN PART** and **DENIED IN PART**; Motion to Strike Stevenson/Jones Report (ECF No. 56) is **GRANTED IN PART** and **DENIED IN PART**; and Motion to Strike Inadmissible Lay Opinions (ECF No. 57) is **DENIED**. Finally, WBWAO's Motion to Strike (ECF No. 60) is **DENIED as moot**.


**IT IS SO ORDERED.**


/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**