# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**DEREK BLOCK,** *et al.*,

        **Plaintiffs,**        **:**

        **Case No. 2:20-cv-3686**

    **v.**        **Chief Judge Sarah D. Morrison**

        **Magistrate Judge Chelsey M. Vascura**

**JIM CANEPA,** *et al.*,        **:**

        **Defendants.**

## <u>OPINION AND ORDER</u>

Plaintiffs' constitutional challenge to Ohio's wine importation laws is before the Court following remand from the Sixth Circuit Court of Appeals. Plaintiff Kenneth M. Miller is an Ohio resident and wine collector. His co-plaintiff, The House of Glunz, Inc., is an Illinois wine retailer with no permit or license from the Ohio Division of Liquor Control.[1] Defendant Dave Yost serves as Ohio's Attorney General. The Wholesale Beer & Wine Association of Ohio ("WBWAO") has intervened as a defendant. The parties' cross-Motions for Summary Judgment (ECF Nos. 114, 116, and 119) and the WBWAO's motion to strike certain testimony and exhibits offered in support of Plaintiffs' Motion for Summary Judgment (ECF No. 120) are ripe for decision.

---

[1] Plaintiff Derek Block voluntarily dismissed his claims. (ECF No. 30.)

## I.    FACTUAL BACKGROUND

### A.    Ohio law establishes a three-tier system for the sale of wine.

Alcohol "is the only consumer product identified in the Constitution. Only its regulation by States is given explicit warrant." *Wine Country Gift Baskets.com v. Steen*, 612 F.3d 809, 813 (5th Cir. 2010). The history of alcohol regulation in America has been told many times. *See Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2462–70 (2019); *Granholm v. Heald*, 544 U.S. 460, 476–89 (2005). Rather than recite the full history here, it is enough to say that Prohibition began with the Eighteenth Amendment and ended with the Twenty-first. *See* U.S. CONST. amend. XVIII, *repealed by* U.S. CONST. amend. XXI. While § 1 of the Twenty-first Amendment repealed the Eighteenth, § 2 prohibits:

> The transportation or importation into any State. . . for delivery or use therein of intoxicating liquors, in violation of the laws thereof[.]

U.S. Const. amend. XXI, § 2. Thus, § 2 "grants the States the power to regulate commerce with respect to alcohol." *Lebamoff Enters. Inc. v. Whitmer*, 956 F.3d 863, 869 (6th Cir. 2020), *reh'g denied*, Case No. 18-2199, Docket No. 56 (May 26, 2020), *cert. denied*, 141 S.Ct. 1049 (2021).

Ohio has taken full advantage of that power. Chapters 4301 and 4303 of the Ohio Revised Code, along with their implementing regulations, establish a comprehensive scheme governing the transportation, importation, distribution, and sale of alcoholic beverages, including wine. Those laws establish a three-tier system for distributing wine in Ohio. Entities operating in each tier (first, suppliers; second, wholesalers; and third, retailers) must obtain a permit from the Ohio

Division of Liquor Control. *See, e.g.,* Ohio Rev. Code §§ 4303.03, 4303.07, 4303.10, 4303.12. Generally, permitted suppliers must sell to permitted wholesalers (who may purchase only from permitted suppliers), *see* Ohio Rev. Code §§ 4303.07, 4303.10, 4301.58(C), and permitted wholesalers must sell to permitted retailers (who may purchase only from permitted wholesalers), *see* Ohio Rev. Code. §§ 4303.03(B)(1), 4303.35; Ohio Admin. Code 4301:1-1-46(B), (F). With limited exception, wine must pass through each tier before reaching a consumer.[2] Wholesalers and retailers are required to maintain a physical presence within the state of Ohio, and all wine sold by those entities is required to "come to rest" at that physical location. (*See* ECF No. 114-1, ¶ 62.a.); *see also* Ohio Rev. Code §§ 4301.10(A)(1), 4301.10(A)(6), 4303.292(A); Ohio Admin Code 4301:1-1-22(B).

To qualify for a permit, participants in the three-tier system must comply with a host of regulations and requirements. *See* Ohio Rev. Code § 4303.25. For example, permit applicants must submit to an initial inspection of their premises by the Ohio Division of Liquor Control's Investigative Services Unit. (ECF No. 116-3, ¶ 7. *See also* ECF No. 53-2, ¶ 14.) A permit holder must then submit to annual renewal inspections of their premises and books and records, as well as inspections based on any complaints the Division might receive. (ECF No. 116-3, ¶ 7. *See also* ECF No. 53-2, ¶¶ 18, 20.) During an inspection, Compliance Agents monitor for

---

[2] The most notable exception is of recent vintage. Beginning in 2007, small wineries could apply for a permit to sell and deliver wine directly to Ohio consumers. (ECF No. 114-1, PAGEID # 5479–80.) In 2021, similar permits were made available to large wineries. (*Id*.) All such wineries are licensed by the federal Alcohol and Tobacco Tax and Trade Bureau. (*Id*.)

adherence to: ownership rules, *see, e.g.*, Ohio Rev. Code § 4301.24(B), Ohio Admin. Code 4301:1-1-24(B); environmental cleanliness and product safety standards, *see, e.g.*, Ohio Admin. Code 4301:1-1-17; minimum pricing requirements, *see, e.g.*, Ohio Admin. Code 4301:1-1-03; and form-of-payment restrictions, *see, e.g.*, Ohio Rev. Code § 4301.24(D). (ECF No. 53-2, ¶¶ 17–18.) If a violation is found, the permit holder may be subject to enforcement action(s), including Correction Notices and fines, up to suspension or revocation of the permit. (ECF No. 53-1, ¶ 24.)

### B. Plaintiffs want to buy and sell wine at retail outside of Ohio's three-tier system.

Plaintiffs challenge two components of Ohio's three-tier system. First, Ohio law prohibits wine retailers who do not have a Division-issued permit from shipping wine directly to Ohio consumers (the "Direct Ship Restriction"). *See* Ohio Rev. Code §§ 4301.58(C), 4301.60, 4303.25, 4303.27. Because Ohio requires permitted retailers to maintain a physical presence in the state, the Direct Ship Restriction has the effect of severely limiting out-of-state retailers' ability to sell their wares to Ohio consumers—even those retailers that are licensed to sell wine by their home state. (*See* ECF No. 52-4, ¶¶ 9–13, 19, 27, 57.) And second, Ohio law prohibits individuals from transporting more than 4.5 liters (six bottles) of wine from out-of-state in any 30-day period (the "Transportation Limit"), further restricting out-of-state retailers' access to the Ohio market. *See* Ohio Rev. Code §§ 4301.20(L), 4301.60.

Mr. Miller is "an active wine consumer who looks for good wines at good prices wherever [he] can find them." (ECF No. 52-2, ¶ 2.) He would like to purchase wine from out-of-state retailers and have it shipped directly to his home in Ohio.

(ECF No. 52-2, ¶ 5.) He would also like to purchase wine while out-of-state and personally transport it back home. (ECF No. 34-5, ¶ 3.) Chicago-based House of Glunz "is a family business . . . engage[d] in retail wine sales, including online sales, and has customers from all over the country[.]" (ECF No. 52-3, ¶ 1–2.) House of Glunz is licensed to sell wine by the City of Chicago and the State of Illinois. (ECF No. 50, 61:7–19.) The company would like to sell wine to Ohio consumers and ship it directly to their homes. (ECF No. 52-3, ¶¶ 5–7.) Plaintiffs contend that the Direct Ship Restriction and the Transportation Limit, which prevent them from engaging in their desired conduct, run afoul of the United States Constitution.

## II.    PROCEDURAL BACKGROUND

Plaintiffs' Complaint challenged the Direct Ship Restriction and the Transportation Limit by bringing claims against four state officials—Jim Canepa, Superintendent of Liquor Control for the Ohio Division of Liquor Control; Dave Yost, Ohio Attorney General; Thomas J. Stickrath, Director of the Ohio Department of Public Safety; and Deborah Pryce, Chair of the Ohio Liquor Control Commission. (ECF No. 1.)

This Court dismissed Plaintiffs' claims against Superintendent Canepa, Director Stickrath, and Chair Pryce after concluding that they were entitled to Eleventh Amendment immunity, and that the *Ex Parte Young* exception to such immunity did not apply. (ECF No. 33.) The Court also found that Plaintiffs lacked standing to challenge the Transportation Limit in a pre-enforcement action because they did not allege a credible threat of prosecution. (ECF No. 36.)

After completing discovery, the parties filed cross-motions for summary judgment on the remaining claim. The Court resolved those motions in a September 12, 2022 Opinion & Order granting summary judgment in favor of Defendants. (ECF No. 91.)

Plaintiffs appealed to the Sixth Circuit Court of Appeals, which issued an Opinion on July 17, 2023. (ECF No. 104.) The Sixth Circuit held that (i) Mr. Miller adequately alleged a credible threat of prosecution under the Transportation Limit and (ii) this Court should have conducted additional analysis of the evidentiary record before granting summary judgment. (*Id.*) It remanded the case for further proceedings, with the express mandate that this Court

> consider the facts and evidence presented in this case and determine whether the challenged statutes (1) "can be justified as a public health or safety measure or on some other legitimate nonprotectionist ground," and whether (2) their "predominant effect" is "the protection of public health or safety," rather than "protectionism."

(*Id.* (quoting *Tenn. Wine & Spirits*, 139 S. Ct. at 2474.)

The parties have since had the opportunity to exchange supplemental discovery and brief renewed motions for summary judgment. (*See* ECF No. 111.)

## III. MOTION TO STRIKE

The Court will first address the WBWAO's motion to strike Tom Wark's expert report and deposition testimony. (ECF No. 120.) Attorney General Yost joins the Motion. (ECF No. 122, PAGEID # 6669.) Plaintiffs responded in opposition (ECF No. 124) and the WBWAO replied (ECF No. 125).

The admissibility of expert testimony is governed by Federal Rule of Evidence 702:

6

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and
> >
> > (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The Rule incorporates the Supreme Court's instruction in *Daubert v. Merrell Dow Pharma., Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), requiring the trial court to serve as a "gatekeeper," tasked with "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. Courts are afforded "considerable leeway" both in determining *whether* to admit expert opinion testimony and *how* to test its reliability and relevance to the case at bar. *Kumho Tire*, 526 U.S. at 152. The proponent of the expert testimony bears the burden of proving its admissibility. *See* Fed. R. Evid. 104(a); *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 478 (6th Cir. 2008). Nonetheless, the Federal Rules of Evidence provide a "permissive backdrop," favoring the admission of expert opinion testimony. *Daubert*, 509 U.S. at 588–89.

Plaintiffs use a 2021 report by Tom Wark, Executive Director of the National Association of Wine Retailers, to support their Motion for Summary Judgment. (*See* ECF No. 119 (citing ECF No. 52-4).) The WBWAO challenges Mr. Wark's

7

qualifications as an expert and the reliability and relevance of his opinions. (ECF No. 120.) As such, they seek to strike Mr. Wark's report and deposition transcript from the record. (*Id*.) The WBWAO's Motion is **GRANTED in part** and **DENIED in part**.

### A. Mr. Wark is qualified to testify as an expert on the retail wine business.

The WBWAO first argues that Mr. Wark is not qualified to testify as an expert in this matter. (*Id*.) As of the date of his report, Mr. Wark had worked as a public relations consultant in the alcohol industry for more than thirty years. (ECF No. 52-4, PAGEID # 1276, 1287.) For thirteen of those, he was Executive Director of the National Association of Wine Retailers and publisher of a daily blog on the business of wine. (*Id*.) Although Mr. Wark's curriculum vitae boasts expertise in "Media Relations," "Wine Industry Marketing," "Marketing Communications," "Alcohol Industry Regulation," "Writing," "Association Management," "Wine Evaluation," and "Wine Industry Politics" (ECF No. 52-4, PAGEID # 1287), Plaintiffs offer him as "an expert in the retail wine business" (ECF No. 124, PAGEID # 6706). His experience managing an association representing wine retailers qualifies him as such. *See* Fed. R. Evid. 702 advisory committee's notes to 2000 amendments ("[T]he text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience.").

**B.    Eleven of the fourteen proffered pieces of testimony are admissible.**

The WBWAO next seeks a ruling that the contents of Mr. Wark's 2021 report are inadmissible. (ECF No. 120.) In his report, Mr. Wark offers "a basic description of the market conditions in which wine consumers and wine retailers interact" as of July 2021. (ECF No. 52-4, PAGEID # 1277.) He also draws ten "conclusions" on the basis of the recited background facts. (*Id.*, PAGEID # 1285.)

Plaintiffs oppose Defendants' motion in part because it is overbroad; only fourteen paragraphs of Mr. Wark's report are cited in their Motion for Summary Judgment. (ECF No. 124.) The Court construes Plaintiffs' argument as a disclaimer of all other paragraphs in Mr. Wark's report and will thus confine its analysis to the fourteen cited.

Paragraphs 10 and 11 discuss the availability of wines for sale in the United States at the national and local levels. Mr. Wark states that "the total number of wines approved and available for resale somewhere in the U.S. could reach up to 1 million." (ECF No. 52-4, ¶ 10.) He further describes the effect of state laws like the Direct Ship Restriction on the number of wines available to those states' consumers. (*Id.*, ¶ 11.) These general market dynamics are appropriate subjects for a wine retailing expert's testimony, and they are relevant because they illustrate the economic impact of state laws like the Direct Ship Restriction. The WBWAO's motion is **DENIED** as to paragraphs 10 and 11 of Mr. Wark's report.

Paragraphs 21, 23, and 24 describe the characteristics and experience of a wine consumer. Mr. Wark describes several legitimate—and perhaps common—

circumstances in which consumers may want to buy and ship wines across state lines. (*Id.*, ¶ 21.) He again stresses the limited number of wines available in common retailer-categories, like grocery stores. (*Id.*, ¶¶ 23, 24.) This testimony is also reliably given and a relevant illustration of how state laws can impact interstate commerce in wine. The WBWAO's motion is thus **DENIED** as to paragraphs 21, 23, and 24.

Paragraphs 29 and 30 describe the experience of a wine retailer. Mr. Wark discusses considerations for brick-and-mortar wine retailers seeking to maximize profit, and the effect of those considerations on the local availability of "rare and collectible wines" in any given market. (*Id.*, ¶ 29.) He opines that the Direct Ship Restriction "bar[s] access to the vast majority of rare, hard to find and collectible wines sold by the[] relatively small number of specialty wine retailers." (*Id.*, ¶ 30.) The Court finds paragraphs 29 and 30 to be reliable testimony on a topic relevant to the issue at hand. The WBWAO's motion is **DENIED** as to paragraphs 29 and 30.

Paragraph 38 provides:

> According to the Wine Institute, 44 states currently allow shipments from out-of-state wineries to consumers. The Wine Institute is the leading authority on the wine production industry in the U.S.

The first sentence is inadmissible hearsay. *See* Fed. R. Evid. 801, 802. Because the first sentence is the report's only reference to the Wine Institute, the second sentence is irrelevant. The WBWAO's motion is **GRANTED** as to paragraph 38.

Paragraphs 41, 42, and 43 summarize the process by which consumers "most commonly" receive wine by direct shipment from an out-of-state retailer in the states that permit such activity. (ECF No. 52-4, ¶ 41; *see also id.*, ¶42 (detailing

10

the steps as they "[m]ost often" occur).) This testimony is also reliable and relevant. The WBWAO's motion is **DENIED** as to paragraphs 41, 42, and 43.

Paragraph 44 summarizes the findings of a 2003 report by the Federal Trade Commission and a 2012 study by the Maryland Comptroller. Those reports, which are included in the record, speak for themselves. Mr. Wark's summary is inadmissible as hearsay and lesser evidence. *See* Fed. R. Evid. 802, 1002. The WBWAO's motion is **GRANTED** as to paragraph 44.

Paragraph 45 states:

> In fact, there has been no study nor any report ever produced by any law enforcement or any alcohol regulatory body that shows the direct shipment of wine from out-of-state retailers has led to a problem with minors obtaining alcohol in any state. While a limited number of academic and law enforcement studies have shown via coordinated "stings" that minors could be able to obtain alcohol via direct shipment, no study has shown that minors actually use the Internet to obtain alcohol. The 2015 National Survey on Drug Use and Health carried out by the Substance Abuse and Mental Health Services Administration looked at how minors obtain alcohol. No minor responding to the national survey cited the Internet as their source of alcohol. In fact, no state has produced any report or evidence that direct shipment of wine from out-of-state wineries or retailers in any way negatively impacts the health and safety of its residents.

The third and fourth sentences of paragraph 45 are inadmissible hearsay for the reasons already discussed. The first, second, and final sentences make sweeping statements that "no" study or report has ever shown that direct shipment of wine to a state's consumers results in certain adverse outcomes. In deposition, Mr. Wark acknowledged that he did not review anything outside the few studies specifically mentioned in his report. (*See* ECF No. 49, PAGEID 674–75.) This is not the type of searching review necessary to support the broad claims in his opinion. The Court

cannot conclude that those sentences are based on sufficient facts or data and so, exercising its gatekeeping function, will exclude them from the record. The WBWAO's motion is **GRANTED** as to paragraph 45.

Finally, in paragraph 54, Mr. Wark states:

> All wine sold at wine retail stores is in sealed containers and has been approved for sale to the public by the TTB and the state alcohol regulatory agency in which the retailer is located. There are no reports of any contaminated or harmful wine sold and shipped from these retailers to consumers.

Neither Mr. Wark nor his proponents have shown the Court that these statements are based on sufficient facts or data to be admissible. The WBWAO's motion is **GRANTED** as to paragraph 54.

### C.    The deposition testimony is properly included in the record.

In view of the above rulings, the Court sees no reason to strike Mr. Wark's deposition testimony from the record. The WBWAO's motion is **DENIED** as to the deposition transcript.

## IV.    MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. *See also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the nonmoving party).

Here, Defendants have submitted sufficient admissible evidence that there is no genuine issue of material fact and they are entitled to judgment as a matter of law. Plaintiffs have failed to present significant probative evidence establishing otherwise.

## A.    This case must be analyzed under *Tennessee Wine*.

Plaintiffs assert that the Direct Ship Restriction and the Transportation Limit unconstitutionally discriminate against out-of-state businesses.[3] As the Sixth

---

[3] Attorney General Yost concedes that Ohio's Direct Ship Restriction discriminates against out-of-state retailers. (*See* ECF No. 116, PAGEID # 5973.) Although the statutes comprising that restriction do not distinguish between in-state and out-of-state businesses on their face (*see* Ohio Rev. Code §§ 4301.01, 4303.12, 4303.22, 4303.27), the Ohio Division of Liquor Control will not issue a permit to a wine retailer that does not maintain a physical presence in the state.

Circuit recently explained in a similar case out of Michigan, such a challenge "turns on the accordion-like interplay" between the Commerce Clause and the Twenty-first Amendment:

> The [Commerce] Clause grants Congress power to preempt or permit state laws that interfere with interstate commerce, and it impliedly "prohibits state laws," as determined by the federal courts, "that unduly restrict interstate commerce." *Tenn. Wine & Spirits*, 139 S. Ct. at 2459. Under the implied prohibition, if a state law discriminates against "out-of-state goods or nonresident economic actors," it may survive only if tailored to advance a legitimate state purpose. *Id*. at 2461.
>
> . . . While the Commerce Clause grants Congress power to eliminate state laws that discriminate against interstate commerce, the Twenty-first Amendment grants the States the power to regulate commerce with respect to alcohol. Section 2 of the Amendment bars "[t]he transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof." U.S. Const. amend. XXI, § 2. The section gives the States broad latitude to regulate the distribution of alcohol within their borders. *See North Dakota v. United States*, 495 U.S. 423, 432–33 (1990) (plurality opinion); *see also id*. at 447–48 (Scalia, J., concurring in the judgment). Indeed, had Congress (as opposed to the people through the ratification process) enacted this exact law, it is doubtful there would be any role for the federal courts to play. When faced with a dormant Commerce Clause challenge to an alcohol regulation, as a result, we apply a "different" test. *Tenn. Wine & Spirits*, 139 S. Ct. at 2474. Rather than skeptical review, we ask whether the law "can be justified as a public health or safety measure or on some other legitimate nonprotectionist ground." *Id*. But if the "predominant effect of the law is protectionism," rather than the promotion of

---

The WBWAO argues that the implicit nature of the discrimination deprives Plaintiffs of standing to challenge it. (ECF No. 114, PAGEID # 5414.) The Court disagrees. The state's position on out-of-state retailers' eligibility for a permit caused Plaintiffs' alleged injury and is redressable. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (discussing the three elements of Article III standing: injury-in-fact, causation, and redressability); *cf. Granholm v. Heald*, 544 U.S. 460, 477 (2005) (explaining that the Commerce Clause prevents states from imposing impermissible burdens on interstate commerce, even through application of "facially neutral laws"); *Day v. Henry*, — F.4th — (9th Cir. 2025) (finding that plaintiffs in an analogous action against Arizona liquor control laws had standing to sue).

legitimate state interests, the Twenty-first Amendment does not "shield[ ]" it. *Id.*

*Lebamoff Enters. Inc. v. Whitmer*, 956 F.3d 863, 869 (6th Cir. 2020), *reh'g denied*, Case No. 18-2199, Docket No. 56 (May 26, 2020), *cert. denied*, 141 S.Ct. 1049 (2021).

In its September 2022 Opinion, this Court endeavored to apply the *Tennessee Wine* test, as illuminated by *Lebamoff*, to Plaintiffs' challenge to the Direct Ship Restriction. (*See* ECF No. 91.) The Court of Appeals found fault in this Court's approach, however, and remanded for further consideration of Plaintiffs' challenge to both the Transportation Limit and the Direct Ship Restriction. In particular, the Court was directed to evaluate

> the facts and evidence presented in this case [to] determine whether the challenged statutes (1) "can be justified as a public health or safety measure or on some other legitimate nonprotectionist ground," and whether (2) their "predominant effect" is "the protection of public health or safety," rather than "protectionism."

(ECF No. 104 (quoting *Tenn. Wine*, 139 S. Ct. at 2474).) The Court will turn to that evidence now.[4]

---

[4] Plaintiffs urge the Court to consider whether there are nondiscriminatory alternatives to the scheme established by the Ohio General Assembly. (*See* ECF No. 119, PAGEID # 6564.) But as the First Circuit Court of Appeals explained in *Anvar v. Dwyer*, that argument "conflates the proper Twenty-first Amendment inquiry with a traditional analysis under the dormant Commerce Clause." 82 F.4th 1, 11 (1st Cir. 2023); *see also id.* at 8 (explaining that nondiscriminatory alternatives are only considered if, after consideration of the *Tennessee Wine* test, "the law's predominant effect is protectionist in nature").

**B.    The challenged laws can be justified on legitimate nonprotectionist grounds.**

The first question before the Court is whether the challenged laws can be justified on legitimate nonprotectionist grounds. The most salient of the legitimate grounds is protecting public health and safety. *Tenn. Wine*, 139 S. Ct. at 2474 (recognizing that "§ 2 was adopted to give each State the authority to address alcohol-related public health and safety issues in accordance with the preferences of its citizens").

In arguing whether the Direct Ship Restriction and the Transportation Limit can be justified as health and safety measures, the parties offer very different framing. Plaintiffs urge the Court to focus on whether direct shipping and personal transportation threaten public health. (*See* ECF No. 119, PAGEID # 6556, 6566.) But Defendants zoom out. They argue that the Direct Ship Restriction and the Transportation Limit are trusses supporting a larger structure—namely, the three-tier system—and cannot be excised for review outside that context. (*See, e.g.*, ECF No. 116, PAGEID # 5973–74.) The difference is significant, as the state must present "concrete evidence" showing the challenged laws' "purpose and effect." *Tenn. Wine*, 139 S. Ct. at 2473–74. In Plaintiffs' frame, the relevant evidence is narrowly drawn to whether bottles shipped or carried across state lines are more dangerous than those that were not. While in Defendants', the relevant evidence goes to the system's effect on public health and safety.

Allowing out-of-state retailers to deliver wine directly to Ohio's consumers would effectively eliminate the role of Ohio's wholesalers and "create a sizeable hole

16

in the three-tier system." *Lebamoff*, 956 F.3d at 872. *Accord B-21 Wines, Inc. v. Bauer*, 36 F.4th 214, 228 (4th Cir. 2022) (observing that striking down North Carolina's corollary to the Direct Ship Restrictions "would open the North Carolina wine market to less regulated wine, undermining the State's three-tier system and the established public interest of safe alcohol consumption that it promotes"), *reh'g denied*, No. 21-1906, Docket No. 58 (June 28, 2022), *cert. denied*, 143 S. Ct. 567 (2023); *Sarasota Wine Mkt., LLC v. Schmitt*, 987 F.3d 1171, 1184 (8th Cir. 2021) (concluding that a physical presence requirement for retailers was an "essential feature of [Missouri's] three-tiered system"); *Wine Country Gift Baskets*, 612 F.3d at 821 (same).. The same would be true if Ohio consumers could import wine themselves by buying from out-of-state retailers and bringing the product in bulk across state lines. The Court is thus persuaded that Defendants' framing is the correct one and will evaluate evidence of the purpose and effect of the challenged laws within the context of Ohio's three-tier system.

Ohio's three-tier system sets out a prescribed supply chain, with a limited number of legislatively considered exceptions. The system is designed to:

(A)    Promote temperance by preventing consumption by underage persons and by discouraging abusive consumption;

(B)    Promote orderly markets by requiring transparent, accountable, and stable distribution of beer and intoxicating liquor and preventing unfair competition; [and]

(C)    Facilitate the collection of taxes related to the sale and consumption of beer and intoxicating liquor.

Ohio Rev. Code § 4303.011. Defendants' evidence shows how the state performs against these goals and what they serve to accomplish.

*Oversight.* Defendants first argue that Ohio's three-tier system allows the state regulatory and enforcement agencies to keep close watch over the movement and sale of wine throughout the state (*see* ECF No. 114-1, ¶ 4), which serves the legislative purposes of preventing underage driving and promoting orderly markets by ensuring that the distribution of wine is done in a transparent and accountable manner. Attorney General Yost offers a recent example illustrating the vital importance of these oversight mechanisms.

In January 2021, the Ohio Division of Liquor Control and the Ohio Investigative Unit ("OIU") launched a joint investigation after a consumer reported becoming ill after drinking "Saint Sadler" wine. (ECF No. 116-3, ¶ 15.) No such wine product was registered with the Division, and no such wine producer was permitted. (*Id.*) The investigation revealed that an individual, Paul Sadler, had purchased several "make your own wine" kits from a permit holder called Grape and Granary, Inc. (*Id.*, ¶ 20.) Though these kits are widely available to home-vintners, their wine is not licensed for sale. (*Id.*, ¶ 19.) OIU executed a search warrant on a warehouse connected to Sadler's operation. (ECF No. 116-5, ¶ 12; *see also* ECF No. 116-6, PAGEID # 6425.) When agents arrived, they found four people actively engaged in the bottling process[.]" (ECF No. 116-6, PAGEID # 6426.) The warehouse was "filthy, with many areas looking to be under construction[.]" (*Id.*) Wine jugs were "uncovered and open to the air with no top or means to prevent contamination." (*Id.*) There was nothing preventing fill hoses from touching the ground and nothing available to clean the fill hoses after use. (*Id.*) The restrooms

"contained no hand soap or sanitary towels" for bottlers "to properly wash hands after restroom use." (*Id.*) OIU confiscated more than 600 intact bottles of Saint Sadler wine and "several gallons" more in various stages of fermentation. (ECF No. 116-5 ¶ 13.) The Division then conducted on-site inspections at licensed retailers suspected of stocking the stuff. (ECF No. 116-3, ¶ 22.) It seized another 437 bottles from eighteen outlets. (*Id.*) This case highlights the importance of physical access to information and premises in policing alcohol sales. It also supports Defendants' position that the three-tier system—including the Direct Ship Restriction and Transportation Limit—can be justified by public health and safety.

*Price Controls.* Defendants next argue that the three-tier system allows the state to control alcohol prices, including by efficient collection of an excise tax at the wholesaler lever. Keeping the price of alcohol high promotes temperance, and tax proceeds are used to offset the societal costs of alcohol consumption. (*See* ECF No. 114-1, ¶ 77.)

Defendants' position is supported by expert testimony on the economics of alcohol use and testimony by individuals working inside Ohio's liquor control agencies. William Kerr, PhD, Senior Scientist and Scientific Director at the Alcohol Research Group, prepared and supplemented an expert report on the purpose and effect of Ohio's liquor control laws. (ECF No. 116-1.) Dr. Kerr has authored or co-authored more than 160 peer-reviewed articles on alcohol-related topics, including trends in alcohol consumption and the effectiveness of alcohol control policies. (*Id.*, ¶ PAGEID # 6072.) Dr. Kerr's report summarizes scholarship on the correlation

between availability, prices, consumption, and bad outcomes within the market for alcoholic beverages. (*Id.*, *generally*.) Generally, as availability increases, prices fall; as prices fall, consumption increases; and as consumption increases, so too do bad outcomes. Against that backdrop, Dr. Kerr opines that:

> Allowing the direct shipment of alcoholic beverages from retailers to Ohio consumers would be expected to increase alcohol consumption, heavy drinking and the consequences associated with alcohol use and abuse through the expansion of alcohol suppliers. Similar problems would be expected to arise if Ohioans were permitted to transport an unlimited quantity of alcoholic beverages into the State for personal consumption. This is particularly true given that the new suppliers in neighboring states may be able to supply the alcohol to Ohio consumers at lower prices, which could increase price competition and lower prices.

(*Id.*, PAGEID # 6077.)

Division agents use on-site compliance checks to ensure that licensed retailers comply with state laws, including price controls. (ECF No. 116-4.) For example, agents compare wholesaler invoices with a retailer's in-store prices to determine whether mandatory mark-ups are being charged. (*Id.*, ¶ 8.) If a retailer is not charging a mandatory mark-up, a Division agent can initiate corrective action, educate the permit holder, and "ensure that the product pricing is immediately changed" while on-site. (*Id.*)

In view of this evidence, the Direct Ship Restriction and the Transportation Limit are justified on public health and safety grounds.

### C. The challenged laws' predominant effect is not protectionism.

The Court next considers whether the facts and evidence presented in this case show that the challenged laws' predominant effect is protectionism.

In support of their argument that the challenged laws' predominant effect is protectionism, Plaintiffs first demonstrate that certain wines—perhaps of a rare vintage or from emerging winemaking regions—are unavailable for purchase from Ohio-licensed retailers. (*See, e.g.*, ECF No. 52-8, PAGEID # 3809–11; ECF No. 52-11, PAGEID # 3825.) Many are also unavailable for Ohio-licensed retailers to sell. (*Id.*) Plaintiffs also show that certain products available for purchase online—for example, a Hickory Farms Mumm Napa Sparkling Wine Gift Box and a wine club membership from K&L Wine Merchants—are unavailable to Ohio consumers because they necessarily require shipment of wine across state lines. (*See* ECF Nos. 52-14, 52-16.) And while K&L Wine Merchants' wine club cannot access the Ohio market, The Wine Merchant (a Cincinnati, Ohio-based wine retailer) has a wine club that can. (*See* ECF No. 52-15.)

Next, Plaintiffs offer evidence that undermines the health and safety goals the state claims to pursue. For example, Plaintiffs undercut Dr. Kerr's testimony by showing that several Ohio retailers sell wine at discount prices—sometimes, for less than $4 per bottle. (*See* ECF Nos. 52-35, 52-36, 52-37.) They also submit studies such as a 2016 report by the National Institute on Alcohol Abuse and Alcoholism showing alcohol consumption by state (ECF No. 52-20), a 2019 report by the National Highway Traffic Safety Administration showing alcohol-impaired driving rates (ECF No. 52-21), and a 2021 report by the National Coalition Against Domestic Violence showing domestic violence rates (ECF No. 52-23). These studies do not show an obvious correlation between a state's decision to allow direct-to-

consumer alcohol shipping and the outcomes they track (though the studies are unaccompanied by expert testimony or statistical analysis).[5]

Finally, Plaintiffs offer correspondence between their counsel and employees at the state liquor control agencies in six states that allow direct-to-consumer shipping. In that correspondence, the state employees respond to counsel's informal request for information about "any regulatory or monitoring issues [that] have arisen concerning improper shipments by permittees, failure to remit taxes, or anything else." (*See, e.g.*, ECF No. 52-30, PAGEID # 3952.) None of the six states report major problems. But the responses are not sworn, and there is little to no information about the responding employee—including whether that individual is authorized to respond or knowledgeable on the topic. The correspondence is now more than four years old.

Defendants argue that the challenged laws' predominant effect is the promotion of health and safety. They offer evidence on the operation and effectiveness of the state's liquor control enforcement agencies. That evidence highlights the importance of on-site inspections. For example, the Division conducts thousands of on-site inspections each year for purposes of renewing permits and investigating complaints. (ECF No. 116-2, ¶¶ 7–9) Between September 1, 2021, and January 31, 2024, the Division issued 935 Correction Notices and 46 formal citations to permit holders. (*Id.*, ¶¶ 10–11.) The OIU conducted another 2,915 on-

---

[5] Construing the evidence in the light most favorable to the Plaintiffs, the Court overlooks certain evidentiary deficiencies in these studies and the manner in which their results are presented to the Court.

site compliance checks between September 1, 2021, and February 02, 2024. (ECF No. 116-5, ¶ 7.)

Beyond being unable to physically inspect store shelves and monitor compliance with laws like mandatory mark-ups and the prohibition against selling alcohol to minors (*see, e.g.*, ECF No. 116-5, ¶¶ 4–6), Dr. Kerr opines that Ohio "does not have effective enforcement tools to use against out-of-state retailers who fail to abide by Ohio law." (ECF No. 116-1, ¶ 34.) He states that fines, suspensions, and revocations would be administratively burdensome and "likely ineffective"—largely because the out-of-state retailers are outside of Ohio's three tier system. He explains that Ohio could not "cut off the flow of alcohol to a non-compliant out-of-state retailer" or "strand[]" a non-compliant out-of-state retailer "with product it cannot sell once its license is revoked or suspended[.]" (*Id.*, ¶¶ 35–36.)

In view of all the evidence in the record, the Court is persuaded that it can decide as a matter of law whether the challenged laws' predominant effect is protectionist. It is not. Defendants have produced concrete evidence that the Direct Ship Restriction and the Transportation Limit are essential components of Ohio's three-tier system, and operate with the predominant purpose and effect of promoting public health and safety. Plaintiffs have not produced sufficient evidence upon which a reasonable jury could find otherwise.

V.      **CONCLUSION**

For these reasons, the WBWAO's Motion to Strike (ECF No. 120) is

**GRANTED in part** and **DENIED in part**. The WBWAO's and Attorney General

Yost's Motions for Summary Judgment (ECF Nos. 114, 116) are **GRANTED**;

Plaintiffs' Motion for Summary Judgment (ECF No. 119) is **DENIED**.

The Clerk is **DIRECTED** to **TERMINATE** this case.


**IT IS SO ORDERED.**


/s/ Sarah D. Morrison
**SARAH D. MORRISON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**
